UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CHRISTA KEETON | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| v. | ] | No. 3-06-0431 |
| | ] | JUDGE HAYNES |
| | ] | |
| THE METROPOLITAN GOVERNMENT | ] | |
| OF NASHVILLE AND DAVIDSON | ] | |
| COUNTY, TENNESSEE, et al. | ] | |
| | ] | |
| Defendants. | ] | |

M E M O R A N D U M

Plaintiff, Christa Keeton, filed this action under 42 U.S.C. § 1983 against Defendants Dylan Kinney, Terrence Graves, Robert Durbin, David Hacker, Michael Gilliland, Brian Gregory, Ryan Lockwood, Bob Doak, Jason Rader and the Metropolitan Government of Nashville, Tennessee, ("Metro"), asserting claims for violating her rights under the Fourth Amendment to the United States Constitution and state law claims of outrageous conduct, assault and battery, and false arrest.[1] Specifically, Plaintiff's claims are that the individual Defendants violated her Fourth Amendment right by their unlawful entry and Defendants Gilliland, Gregory, Lockwood, Doak and Rader violated her Fourth Amendment right to be free from excessive force and an unlawful arrest. Plaintiff also asserts a

_____

[1] Plaintiff's negligence claims were dismissed pursuant to the Court's Orders. (Docket Entry Nos. 30 and 36).

claim that Metro had a custom, practice or policy of unlawful entry into the homes of allegedly mentally unstable citizens without probable cause and using excessive force in its officers' use of taser devices. Plaintiff asserts state law claims of outrageous conduct against the individual Defendants and of assault and battery and false arrest against Defendants Gilliland, Gregory, Lockwood, Doak, and Rader.

Before the Court are Gilliland's, Gregory's, Lockwood's, Doak's, and Rader's motion for summary judgment (Docket Entry No. 102); Kinney's motion for summary judgment (Docket Entry No. 112); and Graves's, Durbin's, Hacker's and Metro's motion for summary judgment (Docket Entry No. 121). All individual Defendants assert qualified immunity to bar this action.

In response (Docket Entry No. 124) Plaintiff agrees that all claims against Metro and the state law claims of outrageous conduct, assault and battery, and false arrest should be dismissed. As to her remaining claims, Plaintiff asserts that genuine issues of material and disputed facts preclude summary judgment.

For the reasons set forth below, the Court concludes that Kinney's motion for summary judgment (Docket Entry No. 112) and Graves's, Durbin's, Hacker's, and Metro's motion for summary judgment (Docket Entry No. 121) should be granted. Gilliland's, Gregory's, Lockwood's, Doak's, and Rader's motion for summary judgment (Docket Entry No. 102) should be granted except for

2

Plaintiff's excessive force claim against Gilliland and Rader involving the use of the taser.

Defendants Graves, Durbin and Hacker filed a motion to dismiss Plaintiff's unlawful entry claim on the basis of qualified immunity. (Docket Entry No. 27). On June 19, 2006, the Court denied Defendants' motion. (Docket Entry No. 37). Defendants appealed to the Sixth Circuit.

Based entirely on the facts presented in the Complaint, the Court found that the Defendants lacked a reasonable basis for believing that exigent circumstances existed when they entered into Plaintiff's home. <u>Keeton v. Metro. Gov't of Nashville and Davidson County</u>, 228 Fed.Appx. 522, 523 (6th Cir. 2007). In resolving the appeal solely on the basis of the facts alleged in the Complaint, the Court relied on the following facts:

> On March 19, 2005, Keeton was at her home grieving the recent death of her mother. Keeton wished to be left alone; however, "an inebriated citizen" who wished to check on Keeton called the police with a claim that Keeton was "depressed." The caller herself was unable to check on Keeton because the caller was too drunk to drive. Sergeant Terrence Graves, Officer David M. Hacker, Officer Robert Durbin, and Officer Dylan Kinney went to Keeton's home in response to this call. The patrol officers knocked on Keeton's door and called her on the phone, but received no response. Without a warrant or Keeton's consent, the patrol officers proceeded to enter Keeton's home by "drilling" the lock on her door. Once inside Keeton's residence, the patrol officers attempted to persuade Keeton to leave her bedroom, but she refused and insisted that the patrol officers leave her home. The patrol officers then left Keeton's residence. After leaving Keeton's home, one or

3

more of the patrol officers told the Crisis Team from the Mental Health Cooperative that Keeton was "loud and agitated, refusing to cooperate" and that "she refused to respond to police negotiators."

Id. (footnotes omitted).

The Court concluded:

Drawing all reasonable inferences in favor of Keeton, the limited and unreliable information that the patrol officers had when they chose to enter Keeton's home cannot support application of the exigent circumstances exception to this case. When the patrol officers forcibly entered Keeton's residence, we must infer that they knew only that a severely intoxicated individual, with no known relationship to Keeton, claimed that Keeton was "depressed." Nothing in Keeton's complaint indicates that the caller believed or told the police that Keeton intended to harm herself. Furthermore, given that the caller was so intoxicated that she could not drive, whatever information the caller relayed was clearly unreliable. Because an unreliable report that an individual is merely "depressed" does not give rise to an exigency, the entry into Keeton's home was unconstitutional. We need not address the question whether, should additional facts emerge in the course of this litigation showing that the patrol officers had additional evidence that Keeton was suicidal or otherwise inclined to harm herself, the patrol officers may be entitled to qualified immunity on that basis.

Id. at 524.

Addressing the second step of the qualified immunity analysis, the Court stated:

It is clearly established that the exigent circumstances exception does not justify conduct normally prohibited by the Fourth Amendment absent some reasonable basis for the belief that an emergency actually exists. "To justify this type of warrantless intrusion police officers 'must be able to point to specific and articulable facts which, taken together with other rational inferences from those facts, reasonably warrant that intrusion.'" Where the police enter a home without a warrant and with no justification beyond an unverified, unreliable report that the occupant of the home is "depressed," the constitutional violation is obvious in light of the

4

general constitutional rule.  Accordingly, the actions as alleged violate a clearly established right even though Keeton has not identified any cases that squarely govern with particularly similar facts.

Id. at 525 (citations omitted).

## II. REVIEW OF THE RECORD[2]

On Saturday March 19, 2005, Plaintiff was at her apartment grieving over her grandmother,[3] who had died a week earlier. (Docket Entry No. 139, response to Defendants' Statement of Undisputed Facts at ¶¶ 2-3).  Kinney, an employee of the Metropolitan Nashville Police Department, was working off-duty as a courtesy officer at Plaintiff's apartment complex.  Id. at ¶ 4. At about 8:30 p.m., Kinney received a telephone call from Sherry Curle, a close acquaintance of Plaintiff's, who informed him of the following: (1) that Plaintiff had recently lost her grandmother, (2) two days earlier Plaintiff had stated that "she might not make it through the weekend," (3) Plaintiff had no other family, (4) Plaintiff had previously attempted suicide by carbon-monoxide poisoning, and (5) Curle had been unable to get into contact with

_____

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment.  Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986).  As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

[3]In her Complaint, Plaintiff refers to her grandmother as her "mother."  (Docket Entry No. 1, Complaint at ¶ 6).

5

Plaintiff all day. _Id_. at ¶ 5; Docket Entry No. 137, response to Defendants' Statement of Undisputed Facts at ¶ 2; Docket Entry No. 145, Defendants' response to Plaintiff's Statement of Undisputed Facts at ¶ 1; Docket Entry No. 128, Kinney Deposition at pp. 9, 12; Docket Entry No. 130, Graves Deposition at pp. 6-7. Kinney asked Curle to come to the apartment complex, but Curle told him that she had been drinking and could not drive. (Docket Entry No. 145 at ¶ 2).

Kinney was unable to locate Plaintiff either by telephone or cell telephone or by knocking on her apartment door. (Docket Entry No. 139 at ¶ 6; Docket Entry No. 130, Graves Deposition at p. 8). Kinney telephoned the Mobile Crisis Unit of the Mental Health Cooperative and confirmed that there was a record of a prior suicide attempt by Plaintiff in 2002. (Docket Entry No. 139 at ¶ 7; Docket Entry No. 102, Exhibit No. 1, Kinney Affidavit at ¶ 5). Kinney also confirmed that Plaintiff's vehicles were parked at the apartment complex. (Docket Entry No. 137 at ¶ 4). Kinney spoke again with Curle and was informed that Curle had called area hospitals and was unable to locate Plaintiff. (Docket Entry No. 102, Kinney Affidavit at ¶ 9). Kinney contacted Graves and advised him of the situation. _Id_. at ¶ 12. Officers Graves, Durbin and Hacker arrived and were briefed by Kinney. (Docket Entry No. 137 at ¶ 5).

6

Graves, Durbin and Hacker knocked on Plaintiff's door and identified themselves "Police", but did not receive any response. Id. at ¶ 6. Kinney climbed up to Plaintiff's window on a ladder, knocked on the glass and shouted he was a police officer, but again received no response. Id. at ¶ 7. The officers then had the apartment service manager to unlock Plaintiff's door. Id. at ¶ 9. After some drilling, Graves determined that one of the locks was locked from the inside, suggestive that Plaintiff was inside. Graves shouted through the hole that the police were there to check on her welfare, but the officers received no response. Id.

Given the lack of any response to their request, Graves concluded that Plaintiff may be injured or deceased and Graves kicked in the front door. Id. at ¶¶ 10-11. The officers remained outside, yelled "Police," and asked Plaintiff to come talk to them. Id. at ¶ 11. Plaintiff did not respond and the four officers entered Plaintiff's apartment yelling "Police". Id. at ¶¶ 11-12; Docket Entry No. 128, Kinney Deposition at 16.

Once inside, Plaintiff spoke from inside her bedroom to the four officers. The officers informed her that they wanted to check on her welfare, but Plaintiff responded with profanity, threatened to sue and ordered the officers to leave. Id. at ¶ 13. Plaintiff warned, "You better not come in here [her bedroom], you know what I'm saying?" Upon hearing this, the officers withdrew from the apartment. Id.

7

Curle arrived at the apartment complex and reiterated her concerns about Plaintiff's suicidal ideation and informed the officers that Plaintiff had at least one shotgun in her apartment. (Docket Entry No. 139 at ¶ 12). Curle had received a ride from a friend. (Docket Entry No. 128, Kinney Deposition at p. 10). According to Kinney, Curle had been drinking, but she was coherent. (Docket Entry No. 102, Exhibit No. 1, Kinney Affidavit at ¶ 16). Because Plaintiff was possibly armed, Graves called the SWAT team and the mobile crisis center was called to the scene. (Docket Entry No. 137 at ¶ 16). The Mobile Crisis Unit was asked to come to make an assessment of Plaintiff's well-being. Id.

Because of the reported presence of firearms, the police officers evacuated Plaintiff's neighbors residing next to her. (Docket Entry No. 139 at ¶ 14). One of these neighbors told police that Plaintiff made suicidal statements two days earlier, reportedly saying she could not decide whether to shoot herself in the front of the head or the side of the head. Id. at ¶ 15. Gilliland, Gregory, Lockwood, Doak and Rader of the SWAT team arrived around 11:50 p.m. and was informed that Plaintiff was suicidal and possessed a shotgun. Id. at ¶ 19; Docket Entry No. 143 at ¶¶ 13, 15.

Over the course of several hours, police negotiators tried unsuccessfully to establish contact with Plaintiff. Id. at ¶ 21. Attempts by police negotiators at establishing contact with

8

Plaintiff included (1) trying to contact Plaintiff verbally through her open apartment door; (2) using a pole camera to determine what she was doing; (3) delivering a "throw phone" into her apartment that rang constantly for a significant length of time; and (4) detonating a distraction device outside of her window. (Docket Entry No. 103, Exhibit No. 6, Affidavit of Ryan Lockwood at ¶¶ 6-7). None of these methods was successful in eliciting a response from Plaintiff. Id.

In her deposition, Plaintiff testified that she was in a deep sleep during these events and was asleep for a few hours between 12:00 a.m. and 6:00 a.m. (Docket Entry No. 139 at ¶ 22). On the night of the incident, Plaintiff had taken Elavil for pain and depression. Id. at ¶ 23.

According to Travis Taylor, a crisis counselor with the Mental Health Cooperative, police personnel and various civilians informed him that: (1) Plaintiff was barricaded in her apartment; (2) Plaintiff would not answer her telephone; (3) Plaintiff would not respond to police negotiators; (4) Plaintiff had been telling people she would not live through the weekend; (5) Plaintiff had a weapon and had been threatening to shoot herself; (6) Plaintiff was taking medicine for anxiety and depression; and (7) Plaintiff had made the statement that she had nothing to live for. Id. at ¶¶ 20, 24. Taylor also learned that Plaintiff had attempted suicide in

9

2002. Id. at ¶ 25. Taylor signed an order authorizing Plaintiff's involuntary committal. Id. at ¶¶ 26, 28.

Pursuant to Taylor's committal order, the SWAT Defendants entered Plaintiff's apartment around 5:30 a.m. to take Plaintiff into custody for a mental-health evaluation. Id. at ¶¶ 29, 31. The SWAT Defendants made voice contact with Plaintiff, but she refused to leave her bedroom. Id. at ¶ 31. According to Gregory, he asked Plaintiff to open her door so that he could see her body and arms to make sure that she had not injured herself. (Docket Entry No. 102, Exhibit No. 5 Gregory Affidavit at ¶ 6). Plaintiff eventually cracked open her bedroom door and stuck out her hands. (Docket Entry No. 143 at ¶ 19). Defendant Rader then fired his taser at Plaintiff, missing her as she shut the door and retreated into her bedroom. (Docket Entry No. 139 at ¶¶ 32, 46).[4]

Rader kicked open the bedroom door, and the other SWAT Defendants pushed past him into the bedroom. Id. at ¶ 34. According to the SWAT Defendants, Plaintiff resisted their efforts to take her into custody. Doak struggled to get Plaintiff's hands together to handcuff her, while Lockwood held Plaintiff's legs to

_____

[4]A taser may be deployed in two modes, the probe mode and drive-stun mode. The probe mode involves the expelling of two probes tethered by wires that conduct an electrical charge, causing total incapacitation when a suspect is struck with both probes. Once the probes are fired, they cannot be retracted and fired again from the same cartridge. The drive-stun mode requires the operator to touch the suspect with the taser device itself, resulting only in localized pain and not in total incapacitation. (Docket Entry No. 139 at ¶¶ 42-45, 47).

10

keep her from kicking him and the other officers. Id. at ¶¶ 35-36.[5] To assist in the handcuffing, Gilliland ordered Rader to apply a taser drive-stun to stop her from resisting. Id. at ¶ 38.[6]

Rader applied the taser in drive-stun mode to Plaintiff's back for its standard five-second cycle. Id. at ¶ 39. Rader admits that he may have lost physical contact with Plaintiff and had to reapply the device to her back on several occasions during the five-second cycle. Id. The download data on the taser indicates that the device was activated only twice on the date in question for two five-second cycles at 5:38:58 a.m. and 5:39:35 a.m. Id. at ¶ 50. The SWAT Defendants were then able to take Plaintiff into custody without the need for additional physical force. Id. at ¶ 40. Two loaded shotguns and a loaded pistol were recovered under Plaintiff's mattress. Id. at ¶ 13. Gregory used no physical force during Plaintiff's seizure. Id. at ¶ 37.

Plaintiff disputes that she resisted from being seized. (Docket Entry No. 104, Plaintiff Deposition at p. 184). In her deposition, Plaintiff testified that the SWAT Defendants jerked her around and "brutally took" her "down hard to the ground." Id. at p. 61. When asked how the SWAT Defendants took her down to the floor, Plaintiff responded:

_____

[5]Plaintiff denies these assertions, citing Plaintiff's deposition, but does not identify the specific pages to support her dispute.

[6]Id.

11

A. Kind of in a tackling-type manner, just bringing me down. But they--as soon as they kicked the door in, it just--it happened really fast.

Q. Did they just sort of trample over you and knock you down, or did they grab you and go down with you like a tackle?

A. They were grabbing me.

Id. at pp. 184-85. Plaintiff testified that she was tasered six times while she was lying on the ground handcuffed. Id. at pp. 61, 179, 190.

Kinney and the Patrol Officers did not take part in Plaintiff's arrest and did not have any physical contact with her. (Docket Entry No. 137 at ¶ 14; Kinney Affidavit at ¶ 20).

### III. CONCLUSIONS OF LAW

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

12

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex</u>, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the

13

need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

14

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

15

. . . .

Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."</u>

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:
In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be

16

read in a light most favorable to the party opposing the motion."
Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

> 1. Complex cases are not necessarily inappropriate for summary judgment.

17

2.    Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.    The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4.    This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.    A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6.    As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.    The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.    The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9.    The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.   The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The

18

trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Section 1983 provides a remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution. There are two essential elements to an action under § 1983: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983.

### A. KINNEY, GRAVES, DURBIN, AND HACKER

Kinney, Graves, Durbin and Hacker contend that Plaintiff has failed to prove that they violated Plaintiff's Fourth Amendment

19

rights by their entry into her residence. Alternatively, these Defendants assert qualified immunity for this claim.

Qualified immunity is an immunity from suit that extends to government officials performing discretionary functions. Blake v. Wright, 179 F.3d 1003, 1007 (6th Cir. 1999). Government officials acting in their official capacities are not liable for civil damages if their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Anderson v. Creighton, 483 U.S. 635, 639 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.").

"The statutory or constitutional rights in question must have been 'so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'" Cullinan v. Abramson, 128 F.3d 301, 309 (6th Cir. 1997) (citations omitted).

While Defendants bear the burden of pleading qualified immunity as an affirmative defense, Plaintiff must show that Defendants are not entitled to qualified immunity. Blake v.

20

Wright, 179 F.3d at 1007. To overcome the qualified immunity defense, the Section 1983 plaintiff must show that the right was clearly established at the time of the violation, Harlow, 457 U.S. at 818, and that "the contours of [the clearly established] right...[were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640; Pray v. City of Sandusky, 49 F.3d 1154, 1157 (6th Cir. 1995) (quoting Anderson). Yet, precedent is not required for all § 1983 claims to conclude that the right is clearly established. In a word, immunity from damages does not attach simply because the particular legal requirement "has never explicitly held to apply...in identical circumstances." Mitchell v. Forsyth, 472 U.S. 511, 535 n.12 (1985).

As to whether the individual defendants are immune from damages on Plaintiff's Fourth Amendment claim, the Court must first determine whether a constitutional violation is presented. In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth its two step approach: first, whether a constitutional violation presented and second, if so, was that right clearly established at the time of the constitutional violation. In Saucier, the Supreme Court stated:

> We have on several occasions addressed the proper
> analytical framework for determining whether a
> plaintiff's allegations are sufficient to overcome a
> defendant's defense of qualified immunity asserted in a
> motion for summary judgment. Qualified immunity is a
> defense that must be pleaded by a defendant official.

21

Gomez v. Toledo, 446 U.S. 635 (1980); Harlow, 457 U.S. at 815. Once a defendant pleads a defense of qualified immunity, "[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. . . . Until this threshold immunity question is resolved, discovery should not be allowed." Id. at 818.

\* \* \*

In Harlow we said that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." Harlow, supra, at 818 (emphasis added). A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.

Id. at 231-32 (emphasis added).

In Pearson v. Callahan, __ U.S. __, 129 S.Ct. 808 (2009), the Supreme Court modified Saucier to allow the district court to answer either or both of these two inquiries.

Where a decision has "been questioned by Members of the Court in later decisions and [has] defied consistent application by the lower courts," these factors weigh in favor of reconsideration. Payne, 501 U.S. at 829-830, 111 S.Ct. 2597; see also Crawford v. Washington, 541 U.S. 36, 60, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Collectively, the factors we have noted make our present reevaluation of Saucier two-step protocol appropriate.

On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is ofter appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

Id. at 818.

22

Given the exigent circumstances here, the appropriate inquiry here is to determine whether a right is "clearly established," for which the Court examines the decisions of the Supreme Court, the Sixth Circuit, other Courts of Appeals and this Court. <u>Robinson v. Bibb</u>, 840 F.2d 349, 351 (6th Cir. 1988). In addition, to determine whether an official would believe a right was clearly established, the Court utilizes an "objective reasonableness" standard, judging whether a "reasonable official in the defendant's position could have believed his conduct to be lawful, considering the state of the law as it existed when the defendant took his challenged actions." <u>Lavado v. Keohane</u>, 992 F.2d 601, 606 (6th Cir. 1993) (quoting <u>Poe v. Haydon</u>, 853 F.2d 418, 423 (6th Cir. 1988)); <u>Long v. Norris</u>, 929 F.2d 1111, 1115 (6th Cir. 1991). The "burden of proof is on the plaintiff to show that the defendant[s] [are] not entitled to qualified immunity." <u>Armstrong v. City of Melvindale</u>, 432 F.3d 695, 699 (6th Cir. 2006).

"Although the absence of a case on point does not necessarily endow a public official with public immunity, 'when this court can uncover only some generally applicable principle, its specific application to the relevant controversy must again have been clearly foreshadowed by applicable direct authority.'" <u>Blake</u>, 179 F.3d at 1007 (internal quotations omitted). Further,

> [t]he contours of the right must be sufficiently clear
> that a reasonable official would understand that what he
> is doing violates that right. This is not to say that an
> official action is protected by qualified immunity unless

23

the very action in question has previously been held
unlawful; but it is to say that in the light of
pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640; see Lyons v. City of Xenia, 417 F.3d
565, 579 (6th Cir. 2005) (noting that there are two paths for
showing that officers had notice that they were violating a
"clearly established" constitutional right-"where the violation was
sufficiently 'obvious' under the general standards of
constitutional care that the plaintiff need not show 'a body' of
'materially similar' case law . . . and where the violation is
shown by the failure to adhere to a 'particularized' body of
precedent that 'squarely govern[s] the case'" at hand) (quoting
Brosseau v. Haugen, 543 U.S. 194, 199-201 (2004).

    The Fourth Amendment guarantees "[t]he right of the people to
be secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures." U.S. Const. amend. IV.  "The
'physical entry of the home is the chief evil against which the
wording of the Fourth Amendment is directed.'" Payton v. New York,
445 U.S. 573, 585 (1980) (quoting United States v. United States
District Court, 407 U.S. 297, 313 (1972)).  Thus, entry into a home
without a warrant by law enforcement officers is "presumptively
unreasonable," id. at 586, but there are exceptions to the warrant
requirement.

    At the time of the Defendants' cited acts, one such exception
is for emergency situations where officers enter a residence for a

24

medical emergency or need for assistance. <u>Mincey v. Arizona</u>, 437 U.S. 385, 392 ("Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid"). "Exigent circumstances are situations where 'real immediate and serious consequences' will 'certainly occur' if the police officer postpones action to obtain a warrant." <u>Thacker v. City of Columbus</u>, 328 F.3d 244, 253 (6th Cir. 2003) (citations and internal quotation marks omitted); <u>Hardesty v. Hamburg Tp.</u>, 461 F.3d 646, 655 (6th Cir. 2006).

In <u>Thacker</u>, 328 F.3d at 254-55, the Sixth Circuit found that exigent circumstances justified a warrantless entry where both police officers and paramedics responded to a 911 call involving a possible suicide attempt. The Court found under the totality of the circumstances that the 911 emergency call, the plaintiff's appearance and conduct, and the uncertainty of the situation, justified entry into the home to secure the safety of the police, paramedics, and others possibly inside the home. <u>Id</u>.

In <u>Ziegler v. Aukerman</u>, 512 F.3d 777, 785-86 (6th Cir. 2008), where the challenged conduct occurred in 2004, the Sixth Circuit found exigent circumstances existed where the officer learned from a 911 call that the plaintiff was suicidal and there was a

25

certificate requesting that she be returned to a hospital. The
Court explained:

> The type of danger at issue should also be considered.
> The act of suicide requires no help from another
> individual and can be accomplished very quickly. To
> require that an officer who has received information from
> a credible source, or sources, that an individual is a
> suicidal risk, wait to obtain a warrant before saving
> that victim, would likely result in countless preventable
> deaths. Surely the "chief evil" the Fourth Amendment was
> designed to protect against was not intended to be taken
> this far.

Id. at 786.

Based on these opinions, the Court concludes, under the
totality of the circumstances that exigent circumstances existed
justifying the warrantless entry into Plaintiff's apartment by
Kinney, Graves, Durbin and Hacker. The officers had information
that: (1) Plaintiff had previously attempted suicide; (2) that
information was corroborated by the Mobile Crisis Unit of the
Mental Health Cooperative; (3) Plaintiff earlier stated that "she
might not make it through the weekend"; (4) her friend had been
unable to get into contact with Plaintiff all day; (5) Plaintiff's
vehicles were on the premises and her door was locked from the
inside; and (6) Plaintiff was non-responsive to telephone calls,
knocks on her door and window, and verbal contact through her door,
windows and the hole in the door.

Under these facts, the Court concludes that Kinney, Graves,
Durbin and Hacker had a reasonable belief that a legitimate

26

emergency existed and that such exigent circumstances justified these officers' entry into Plaintiff's apartment.

Plaintiff argues that the Court should deny these Defendants qualified immunity because the Sixth Circuit affirmed this Court's previous denial of the Patrol Officer's motion to dismiss based on qualified immunity.

In the earlier appeal, the Sixth Circuit stated, "This appeal from a denial of a 12(b)(6) motion to dismiss must be resolved solely on the basis of facts alleged in Keeton's complaint, which, for purposes of this appeal, we accept as true." Keeton, 228 Fed.Appx. at 523. Drawing all reasonable inferences in favor of Plaintiff, the Sixth Circuit found that these factual allegations did not support the application of the exigent circumstances exception to her case. Id. at 524. Yet, the Sixth Circuit also stated that "We need not address the question whether, should additional facts emerge in the course of this litigation showing that the patrol officers had additional evidence that Keeton was suicidal or otherwise inclined to harm herself, the patrol officers may be entitled to qualified immunity on that basis." Id.

Plaintiff argues in essence that the information Curle provided was unreliable because she was drunk. Plaintiff has not presented proof of Curle's actual condition. Kinney testified that Curle only stated that she had been drinking and did not feel that she was in a condition to drive. (Docket Entry No. 128, Kinney

27

Deposition at p. 10). In addition Kinney stated that at the scene he could discern Curle had been drinking, but considered Curle to be coherent. See Hale v. Kart, 396 F.3d 721, 730 (6th Cir. 2005) ("[A] reasonable officer [could] rely on information given him by someone who has consumed alcohol and . . . was 'a little bit intoxicated.'").

Aside from Kinney's observation of Curle, the Mobile Crisis member of the Mental Health Cooperative confirmed Plaintiffs's record of a prior suicide attempt in 2002. This independent fact was not considered in the prior appeal.

Even if the officers were mistaken in their assessments of these additional facts, immunity would attach here. As the Supreme Court stated in Saucier:

> Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of . . . exigent circumstances, . . . and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, Anderson still operates to grant officers immunity for reasonable mistakes as to the legality of their actions.

533 U.S. at 206; see Anderson, 483 U.S. at 641.

Accordingly, Plaintiff's claim against Kinney, Graves, Durbin and Hacker should be dismissed.

### B. GILLILAND, GREGORY, LOCKWOOD, DOAK, AND RADER

Gilliland, Gregory, Lockwood, Doak and Rader contend that Plaintiff has failed to demonstrate that their actions violated

28

Plaintiff's right to be free from unlawful entry, illegal seizure and excessive force as guaranteed by the Fourth Amendment. Alternatively, these Defendants assert that they are qualified immune from suit.

### 1. *Unlawful Entry and Illegal Seizure*

Similar to Kinney, Graves, Durbin and Hacker, the SWAT Defendants had a reasonable basis to enter Plaintiff's home under the totality of the circumstances. In addition to the facts known to Kinney, Graves, Durbin and Hacker, the SWAT Defendants also obtained information that Plaintiff had a shotgun inside her apartment and received information from one of Plaintiff's neighbors that two days earlier Plaintiff had stated that she did not know if she should shoot herself in the front of the head or the side of the head. The SWAT Defendants also tried over several hours numerous methods of trying to elicit a response from Plaintiff, including detonating a distraction device outside her window, that proved ineffective. Further, the SWAT Defendants were acting pursuant to an involuntary committal order that had been issued under Tenn. Code Ann. § 33-6-404 by the crisis counselor at the scene.

Tennessee Code Ann. § 33-6-404(1)(A), (2) provides that a licensed physician, psychologist, or designated professional may take a person into custody under § 33-6-402 for an immediate

29

examination to decide whether the person is subject to admission to a hospital or treatment resource. Tennessee Code Ann. § 33-6-402 states that:

> If an officer authorized to make arrests in the state, . . . has reason to believe that a person is subject to detention under § 33-6-401, then the officer . . . may take the person into custody without a civil order or warrant for immediate examination under § 33-6-404 for certification of need for care and treatment.

Section 33-6-401 requires that if a person has a mental illness or serious emotional disturbance, and as a result, that person poses an immediate substantial likelihood of serious harm then that person may be detained under § 33-6-402. A person poses "an immediate substantial likelihood of serious harm" if the person has threatened or attempted suicide or to inflict serious bodily harm on oneself and there is a substantial likelihood that the harm will occur unless the person is placed under involuntary treatment. Tenn. Code Ann. § 33-6-501(1)(A), (2).

Accordingly, for all these reasons, the Court concludes that given the mental health counselor's report and the committal order, Gilliland, Gregory, Lockwood, Doak and Rader lawfully entered Plaintiff's apartment and lawfully seized her pursuant to the involuntary committal order.

### 2. Excessive Force

As an initial matter, Plaintiff admits that Defendant Gregory did not use any physical force on Plaintiff during her seizure. (Docket Entry No. 139 at ¶ 37). Accordingly, Plaintiff's excessive

force claim against Gregory during her initial seizure and the use of the Taser is dismissed.

Under the Fourth Amendment, an officer's use of force must be objectively reasonable, and "courts must balance the consequences to the individual against the government's interests in effecting the seizure." Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir. 2002). In defining the boundaries of the Fourth Amendment, the Supreme Court has explained:

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force;

31

nor will an officer's good intentions make an objectively
unreasonable use of force constitutional.

Graham v. Connor, 490 U.S. 386, 396-97, (1989) (citations and
quotations omitted).

A claim of excessive force and the defense of qualified
immunity have distinct inquiries. Saucier, 533 U.S. at 204. While
an excessive force claim is analyzed using the "objectively
reasonable" test of the Fourth Amendment, qualified immunity has an
additional inquiry. Id.

> The concern of the immunity inquiry is to acknowledge
> that reasonable mistakes can be made as to the legal
> constraints on particular police conduct. It is
> sometimes difficult for an officer to determine how the
> relevant legal doctrine . . . will apply to the factual
> situation the officer confronts. An officer might
> correctly perceive all of the relevant facts but have a
> mistaken understanding as to whether a particular amount
> of force is legal in those circumstances. If the
> officer's mistake as to what the law requires is
> reasonable, however, the officer is entitled to the
> immunity defense.

> Graham does not always give a clear answer as to whether
> a particular application of force will be deemed
> excessive by the courts. This is the nature of a test
> which must accommodate limitless factual circumstances.

Id. at 205.

a. The Use of the Distraction Device or Concussion Grenade

In her response, Plaintiff asserts that the use of a
"concussion grenade" constitutes excessive force. The distraction
device was detonated outside her apartment and not inside.
Plaintiff has failed to establish how making a loud noise outside
her window constitutes a constitutional violation. Nor has

32

Plaintiff cited any case authority to support this contention.[7]  If any property damage resulted, the appropriate remedy, if any, would lie in tort.  United States v. Dawkins, 83 Fed. Appx. 48, 51 (6th Cir. 2003).  Accordingly, this claim is without merit.

### b. The Initial Seizure of Plaintiff

Plaintiff asserts in her deposition that the SWAT Defendants jerked her around and "brutally took" her "down hard to the ground" and were "grabbing" her.  To be sure, courts have "long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham, 490 U.S. at 396.  "The question is whether the undisputed facts 'demonstrate that [] hypothetical reasonable officer[s]' would have 'known that [their] actions, under the circumstances, were objectively unreasonable,' not whether [the] [o]fficers [ ] used the least intrusive means available."  Lyons, 417 F.3d at 576.

If Plaintiff were able to establish a constitutional claim, Plaintiff has failed to establish a violation of a "clearly established" constitutional right.  In Lyons, 417 F.3d at 570, a female officer attempted to arrest the plaintiff while in the plaintiff's home and the two women became involved in a struggle. The female officer radioed for help, and a male officer responded

---

[7]Plaintiff's reliance on Ginter v. Stallcap, 869 F.2d 384, 388 (8th Cir. 1989) is inapposite as that case involved the deployment of tear gas and diesel fuel into a home to smoke out a suspect.

by running into the plaintiff's house at full speed and tackling the plaintiff. Id. In finding qualified immunity, the Sixth Circuit stated that the alleged constitutional violation was not "obvious" given the officer-safety problem faced by the officer upon entering a house after receiving a distress call from a fellow officer and where he observed upon entering that the officer and resident were in close proximity to each other and in the middle of some form of confrontation. Id. at 579.

The Court also stated that it could not find a "single case predating the conduct at issue that prohibits tackling in a materially similar context." Id. The Court explained that because the focus is on whether the officer had fair notice that his conduct was unlawful, and because the defendant's actions at best "fell in the 'hazy border between excessive and acceptable force,'" the plaintiff failed to show the violation of a clearly established right in this more "particularized" sense. Id. (quoting Brosseau, 543 U.S. at 600) (citation and internal quotation marks omitted).

Absent relevant precedent with similar facts and given that Plaintiff's mental health and failure to cooperate with the officers' requests, the Court concludes that Plaintiff's claims against the SWAT Defendants' actions fall in the "hazy border between excessive and acceptable force." Accordingly, Plaintiff's claim against these Defendants fails.

34

c. The Use of the Taser Device

Plaintiff alleges that she did not resist arrest and that she was handcuffed when she was tasered. The only two SWAT Defendants implicated by this claim are Rader, who deployed the taser, and Gilliland, who ordered the deployment of the taser. These Defendants assert that Plaintiff did resist arrest and the taser was used to secure Plaintiff· in order to handcuff her.

The use of gratuitous force on a subdued suspect who has already been placed into handcuffs is unconstitutional. <u>Shreve v. Jessamine Cty. Fiscal Court</u>, 453 F.3d 681, 688 (6th Cir. 2006); <u>McDowell v. Rogers</u>, 863 F.2d 1302, 1307 (6th Cir. 1988); <u>see Champion v. Outlook Nashville, Inc.</u>, 380 F.3d 893, 903 (6th Cir. 2004) (holding that the use of a chemical spray on a suspect who was already handcuffed and no longer posed a threat to the safety of the officers or others constituted excessive force).

"While the issue of qualified immunity normally rests with the court, in cases arising under the Fourth Amendment's reasonableness standard the applicability of qualified immunity will often turn on the resolution of contested factual issues." <u>Fisher v. City of Memphis</u>, 234 F.3d 312, 317 (6th Cir. 2000). In this case, the parties have asserted conflicting accounts.

"Although the application of qualified immunity comprises a legal issue, summary judgment is inappropriate when conflicting evidence creates subordinate predicate factual questions which must

35

be resolved by a fact finder at trial." <u>Hamilton v. Myers</u>, 281 F.3d 520, 531 (6th Cir. 2002) (citing <u>Anderson v. Creighton</u>, 483 U.S. at 641).

Viewing the facts in the light most favorable to Plaintiff, as the party opposing summary judgment, the Court finds that a genuine issue of material fact exists as to whether Rader and Gilliland used excessive force in tasering Plaintiff. The right to be free from excessive force is well established, and Rader and Gilliland certainly knew that any force they exerted must be reasonable. <u>Kain</u>, 156 F.3d at 673. As for whether the degree or manner of force they used was objectively reasonable, that issue is a question of fact to be decided by a jury and not a legal issue to be decided by the Court. <u>Id</u>.

"'Where, as here, the legal question of qualified immunity turns upon which version of facts one accepts, the jury, not the judge, must determine liability.'" <u>Fisher</u>, 234 F.3d at 317 (quoting <u>Sova v. City of Mt. Pleasant</u>, 142 F.3d 898, 902 (6th Cir. 1998)). Accordingly, the Court finds that Rader and Gilliland are not entitled to qualified immunity and denies their motion for summary judgment pursuant to that defense on the taser claim.

IV.

Accordingly, Dylan Kinney's motion for summary judgment (Docket Entry No. 112) and the motion of Terrence Graves, Robert Durbin, David Hacker and Metro for summary judgment (Docket Entry

36

No. 121) should be granted. Michael Gilliland's, Brian Gregory's, Ryan Lockwood's, Bob Doak's, and Jason Rader's motion for summary judgment (Docket Entry No. 102) should be granted except for Plaintiff's excessive force claims against Gilliland and Rader as set forth in this opinion.

An appropriate Order is filed herewith.

**ENTERED** this the _6th_ day of July, 2009.

WILLIAM J. HAYNES, JR
United States District Judge

37